Good morning, I'm John Lambert on behalf of Mr. Milbourn, the appellant, and if the Court pleases I'd like to reserve at least a minute to a minute and a half of rebuttal time. This Court's aware of the fact that there are two certified issues before the Court. The two certified issues are substantive claims of constitutional error, one claim sounding under Doyle v. Ohio, the other claim sounding under Darden v. Wainwright and Donnelly. Both prosecutorial misconduct claims, the first one dealing with the prosecutor's inappropriate impeachment or introduction of evidence of Mr. Milbourn's constitutional right to invoke his Fifth Amendment privilege against self-imprimination and ask for an attorney. He actually talked after that, didn't he? I mean, he volunteered some emergencies. Voluntary statements well after, probably, you know, the record isn't real clear on that, but it was on the ride from Laughlin to Las Vegas, so it was probably two or three hours after he invoked. So, really, what's the harm in the question? The prosecutor didn't actually comment on his failure to give a statement or anything like that? The prosecutor didn't make a comment on that in closing argument. What the prosecutor did, as the prosecutor did in Doyle, was introduce evidence of, it brought it in through the arresting officer's testimony. Officer Pritchett testified that I Mirandized him, he invoked his right to remain silent, he wanted an attorney. That's how the evidence came out. The evidence came out in the prosecutor's case in chief during the direct testimony. Doyle didn't have a situation where the guy volunteered some information later, did he? Doyle did not. Doyle, the case in Doyle was that the two defendants testified that the confidential informant had been indeed the seller of the drugs, they weren't the seller of the drugs, and what the prosecutor did with impeachment was say, well, why didn't you tell all of this information to the police? If it was exculpatory information, you should have done that. And that was the Doyle error. So, really, there... No comment in the closing argument in Doyle? I'm not sure if there was in Doyle. In this case, there was no comment in Doyle. I thought there was in Doyle. There may have been, and in this case, the trial judge, during the motion for mistrial that was conducted outside the presence of the jury, admonished the prosecutor not to say anything. The trial judge did mention the fact that he was, that, you know, that it was a concern that this evidence did come in, but... So, basically, counsel, on this comment, then we have concern about one answer from a police officer in the course of a fairly lengthy trial. Right. Yes. In which there seems to be quite a bit of evidence. You've argued that it was weak and circumstantial. It was circumstantial, but it does seem to be quite a bit of evidence. Right. And I wanted to talk about that, obviously, because, and before I do get to the Brecht analysis, I think that, you know, this is not just the Doyle error. There's also the, what I would consider, the very compelling error that this Court addressed many years ago in Standen v. Whitley, and that's commenting on plea negotiations. And, obviously, this isn't as compelling as the Standen case, where in Mr. Standen's trial, the State introduced evidence of the fact that he had pled guilty and withdrew that plea. In this case, in Mr. Milborne's case, the State introduced evidence during Mr. Milborne's cross-examination that Mr. Milborne had tried to, you know, tried to get some plea negotiations going. He said, I want to plead guilty. I want to get this thing over with. They brought it in through Milborne's cross-examination, and then, if that wasn't bad enough, they, in their rebuttal case, they called the correctional officer to talk about how Mr. Milborne wanted to do, to conduct these plea negotiations, because he wanted to get his glasses. I mean, it was really kind of tragic, because he'd been sitting in the county jail for 10 months, and he was just kind of losing it. He said, you know, I've got to get out of here. What's your best Supreme Court precedent to say that that's an unconstitutional practice? I think in Standen, this Court cited Kirchhoffall, United States versus, I think it's United States versus Kirchhoffall. It's a due process violation, where, you know, in the Standen case, and again, I mean, you know, I don't mean to submit that this case is on point with Standen. It's not. But we're talking about, you know, the attempt to get, to make discussions with regard to plea negotiations. Most of that, most of the error in that would be where the defendant is in court with his lawyer, or they were in negotiations with the prosecution. That wasn't the situation here at all. He was just talking to somebody at the prison or jail. Yeah, it doesn't necessarily, the plea negotiations discussions don't need to be in court. They could be at a coffee shop or at the prosecution. No, it's with his counsel or with opposing counsels, not with a guard or a guy down the street or somebody who's a police officer. Right, right. Yeah, again, I don't mean to suggest that this is directly on point with Standen, but it certainly was presented as constitutional in the Nevada Supreme Court. Counsel, if he had, if he'd been talking to a prison guard and had said, yeah, I did it, I dumped his body down a mine shaft, would that be admissible in court? Well, it depends on the circumstance. I think if it was, you know, again, to take your hypothetical. Well, he's been sitting in the jail for 10 months. He's been given the Miranda warnings. He has an attorney. But he's talking with a jailer who's not asking him any questions, and he just says it. Right. I think under those circumstances, if indeed a court had heard all of the evidence surrounding what your hypothetical concluded that the statement was voluntary, then it would be admissible. And if he says to the guard. If I say, you know, confidential informant or the guard was playing him a little. If the guard's been planted there and trying to get whatever information he can, but that doesn't seem to be our situation here. Now, if he says to the guard, call my lawyer because I dumped his body down a mine shaft and I want to talk to him, would that then be admissible? Obviously, my knee-jerk reaction would be that it's not admissible because it's conditioned with a call my lawyer, you know. Yeah, but that's not the guard's fault. It's not the guard's fault. It hasn't been prompted by anything. Absolutely. And, of course, we're not, you know, I mean, I don't mean to. That brings us then to the third question, of course, is what happens when he says to the guard, call my lawyer. I want to plead guilty. Right. And, see, to me, to me, I want to plead guilty is the ultimate sanction. What he's saying is, at that point, unlike your, you know, your inculpatory statement, which I think is more colored by a Fifth Amendment question and whether or not there is indeed still a retained Sixth Amendment right to counsel when that statement's made, I think when the defendant says, I want to plead guilty, all sorts of alarms go off, because what the defendant is then saying is, you know, I'm not just incriminating myself, but I want to waive the entire panoply of constitutional rights that I have, the right to confront witnesses, the right to present witnesses, the right to counsel, to a certain extent, the right to appeal. That's a much, that's a bigger deal, I think, than making, you know, than making an inculpatory statement, because it's colored by, you know, at least, you know, again, borrowing on the Standen case, and then I, and Kirchoffel, which I believe is a very old case, a lot of precedent, jurisprudence from the United States Supreme Court, that you just can't get into that statement. That statement is just, you know, verboten. It's something that you, you know, that cannot, it can be cured, you know, if it, I mean, not cured, but it can be deemed harmless. I'm not saying that it's structural error, and, you know, that's. Why don't we turn to the question, then, of whether this is harmless error, and tell us, put this in context for us as to why these two statements so undermine our confidence in the result here, that we ought to overturn it. I think that, really, the way we get to that point is, is that, you know, we have nothing to defer to, so, really, the epidephrine standard is not necessarily in play. I think this is very, very close to what this Court was dealing with in the Inthevong case. There was dicta in Inthevong that said that if the highest state court does not conduct a harmless error analysis, which the Nevada Supreme Court did not do. They just dropped the footnote saying, we've reviewed all these other issues and find them to be without merit. Two of those issues were the two constitutional errors we've been discussing. So what we're talking about is Brecht error. Is that error, singularly or in combination, does that error, in this Court's opinion, did it have a substantial and injurious effect on any one of the jurors' decisions to vote for guilt? And so it's not a Jackson versus Virginia analysis. It's not, was there sufficient evidence to support the guilt beyond a reasonable doubt? That's not what we're talking about. And I kind of like to compare it to, you know, if you're making, I don't know, I was trying to think of a good way to do this. If you're making some spaghetti sauce and you drop bleach into it, you know, that's going to ruin the entire sauce. And that's what happened here. You have a trial. You drop air into it that ruins the entire trial. Well, I think that's a pretty fantastic analogy. Well, I think it's. I look at the high evidence against him, which I think there was plenty. Well, it depends on, you know, again, there was plenty, but it was circumstantial. What's wrong with that? Compelling circumstantial evidence came from the pathologist who was all over the board. The pathologist could not give a time of death that made any sense medically, and he basically admitted that on cross-examination. Did the client pretend the victim was still alive? Well, according to my client's. After his body had already been found. Well, and again, according to my client's testimony, he was getting that information from this Brian guy that he met with the victim. But, I mean, it was a story that really rebothered against him. But, you know, if you look at his conduct after this all happened, it wasn't the kind of conduct of somebody who was trying to hide his guilt. He went to California. He remodeled the Jeep the way that Rushford wanted him to remodel it. He drove it. He didn't change the license plate. He wrote checks, leaving Rushford's on basically with Rushford's license plate as collateral and security, charged on Rushford's charge account. This was not a guy that was heading to Argentina to get away from a murder that he had committed. You know, his conduct was completely innocent. But I think if you go right back to what the pathologist testified to, the time of death could have been anywhere from 24 and maybe even more, 30 hours, prior to finding the body at 3.30 on June 2nd, to as little as, and this was the defendant's theory in closing argument, was that given the circumstantial evidence that was available at the scene, the fact that the hood from the truck had been seen leaning against the truck at noon by Mrs. Seaton, was dragged, and then at 3.30 the hood that was leaning against the truck was covering the body, the fact that there was fresh blood, red blood, at the scene underneath Mr. Rushford's body, the fact that the rigor mortis and the liver mortis that had set in was all indicative of death having occurred within a short period of time from finding the body, leads to an absolute alibi for Mr. Milborn. Because Mr. Milborn, from at least 9 o'clock the night before until 6 p.m. the day they discovered the body was in the presence of Mary Cain. And Mary Cain, the state's own witness, testified to that, and she said that she and Milborn did not leave each other for more than 20 minutes, that entire period of time. And if that's the case, again, by the state's own testimony, by the state's own evidence, Milborn couldn't have driven from Laughlin to the scene of the crime, which was an hour and a half drive. So if indeed, again, you know, the evidence is circumstantial, and I admit, Judge Noonan, that you can convict with circumstantial evidence, but not with this circumstantial evidence. This circumstantial evidence was all over the board, and the state's theory of the case, and was mentioned in opposing counsel's brief, was that the window of opportunity for the death was that period of time based upon Dr. Clark's testimony, and that window of opportunity had to, you know, in order for that window of opportunity to be at all evidential, to have any valid evidentiary value, that you had to take as unequivocal medical testimony Dr. Clark's theory that Mr. Rushmore was killed 24 hours before finding him. And I just couldn't, I mean, it just, by his own admission, if you read cross-examination of Dr. Clark, in several places he talks about it being just a rough estimate. Well, you know, I mean, a rough estimate, we're talking about a man who's doing two life without sentences based on this rough estimate. He also says that, yeah, it's possible, you know, he essentially concedes that the death could have occurred within 12 hours of having found the body. Now, if that's the case, if you find the body at 3.30 on June 2nd, and you go back in time 12 hours, that's 3.30 in the morning that same day, Milbourne is with Mrs. Kane. He slept with her. They slept together. Again, read Mrs. Kane's testimony. It's at excerpts of record 137 to 160. They did not separate for more than 20 minutes. That just doesn't square with the state's window of opportunity theory, because Milbourne would have had a rock-solid alibi. And that's why, you know, that's my analogy, and maybe it's a little over the top, but, you know, this is not a situation where, you know, this is error. I mean, particularly the jury hearing evidence that he was ready to plead guilty, you know. I mean, that's pretty bad. As this Court said in Standen, it doesn't get any worse than that. And, again, you know. Counsel, what do we do, for example, I'm looking at page 22 of the state's brief, that Milbourne actually signed a note, it was Exhibit 81, showing that Milbourne had met with the victim and obtained a sample of cocaine on June 5th. The body had already been found on June 3rd. Right. And, again, Milbourne testified about that note. He was definitely cross-examined about that note. And his testimony was, they just gave me this thing and I signed it, but what I was trying to explain to them, and, again, this was his testimony, was that I was getting this information from this fellow named Brian. Who was that fellow? I'm sorry? Who was this fellow giving him? Who was that fellow that you're referring to? Brian was the guy who came down from Reno with Michael Rushford, who Milbourne. Was he identified further? No, he was not identified further by. Did he appear at the trial? No, he did not. Was he a creature of the defendant's imagination? Well, that was the state's jury judge, but that's. I mean, that's sort of the common sense reaction to that kind of story. Well, again, you know, it was what happened. It was what Mr. Milbourne. What he said happened, yeah. Exactly. It's what Mr. Milbourne's testimony was. And, again, in response to your question, Judge Bybee, that was Mr. Milbourne's explanation. Yeah. I mean, he's driving his car. He's got his credit cards. He's lying about having seen him. He's creating an effective alibi by calling Rushford's brother and asking him if he's seen him. I mean, these are ways in which somebody who's committed a murder might very plausibly be covering it up. Well, and, again, that was the state's theory. But my response to that is Richard Milbourne waived his Fifth Amendment right, took the stand, and tried to explain that. He got on the stand. He tried to make as best an explanation as he could for that. You say it was the state's theory. It was what the jury heard and decided your client was lying. And they could have made that decision based on the fact that the state introduced evidence that he wanted to plead guilty. I mean, what are we spending all this time for if the guy wants to plead guilty? You know, to me, that's Breck there. In that Standen case, did the defendant make a statement to a prison guard? Standen, like I said, Standen, again, I don't mean to suggest that Standen is directly on point. I want to make that perfectly clear. In Standen's case, Mr. Standen pled guilty. He got the guilty plea set aside because it was not voluntary. Something he did in court, right? Yes. And at the trial, the state introduced the fact that he pled guilty. Yeah. Right. Unless the Court has any questions, I'll reserve my time. Okay. Let's hear from the State. If it pleases the Court, my name is David Neidert. I'm a Senior Deputy Attorney General for the State of Nevada. I think looking at the two issues that have been presented, first of all, there's a real question, and I think it's first need to be addressed, the District Judge sort of squirted right back at us as to whether there was Doyle error at all. The District Court said, well, assuming there was Doyle error, he can't survive Brett given the strength of the State's case against Mr. Milborn. The problem with saying that there was, in fact, Doyle error has to do with language that Justice Stevens, writing several years later in the case of Wainwright v. Greenfield, wrote that what is impermissible is the evidentiary use of an individual's constitutional rights to remain silent or consult with counsel. There was no evidentiary use of this. What there was was the elicitation from the Highway Patrol officer that arrested Mr. Milborn that he's read in his rights, Mr. Milborn invoked, and that later on Mr. Milborn started talking and made statements that were exculpatory towards himself. I'm not going to defend the prosecutor for the artfulness of what was how he went about it, but basically I don't think he should have done it. I'm saying it's not Doyle error. I'm saying that the judge was very, very correct in, A, admonishing the prosecutor, don't do that, move away from that area, and at the same time not declaring a mistrial. Motion for mistrial requesting? I think there was. The problem, I think what the prosecutor was trying to do, and it's hard looking at a cold record trying to read the mind of why somebody's doing in the heat of trial what they do, is he was trying to sort of let the jury know that Mr. Milborn knew about his rights, but he still opened his mouth and started yakking during that long drive back to Las Vegas, and by doing that, and to sort of put it into context, because everybody, I won't say everybody, but anybody that's watched more than about five hours of crime drama on television is somewhat aware of what the Miranda rights say, and so I think he was trying to diffuse an issue in the juror's mind of, well, did the officer Mirandize him? Even though, as we all know, there really wasn't a Miranda situation where a person starts making voluntary statements that are not the result of interrogation. So on that basis, I don't think, and then the prosecutor never touched on it again, never mentioned it again, and there was never anything beyond that little limited bit of trial where this issue ever arose, and on that basis, I would respectfully submit that there was not a Doyle error at all. Certainly, if there was a Doyle error, then I think a Brecht analysis clearly shows there was not a substantial and injurious effect on the jury's verdict. Mr. Lambros raised an interesting analogy. He said if you're making spaghetti and you pour bleach on it, that would have a substantial and injurious effect on a jury's verdict. I think that's an incorrect standard, using his analogy, because if you use his analogy, you put bleach on spaghetti, the spaghetti is ruined. You can't put a little bit of bleach on spaghetti. Basically, what Mr. Lambros' analogy is trying to do is make Brecht a structural error analysis. If you do anything to ruin the trial, you get a new one. I would suggest that if you want to use Mr. Lambros' spaghetti sauce analogy, the better example is adding too much salt and whether that spaghetti sauce is still edible with a little bit too much salt in it. If you can taste the spaghetti sauce and it still tastes like edible spaghetti sauce and something you can put on your spaghetti, then there hasn't been a substantial and injurious effect on the spaghetti sauce. On the other hand, if you dump a whole container of salt into the spaghetti sauce, making it totally inedible, then certainly there has been a substantial and injurious effect on the spaghetti sauce. I have to admit, Mr. Neidert, that you've changed the analogy dramatically. When Mr. Lambros said that, I thought he said he added the leech. I didn't hear him say bleach, so I think I misunderstood that. It's changed my whole perception of the analogy, but thank you for clarifying that. I heard bleach and if he said leech, I apologize. We'll just have to get clarification on that on rebuttal, I'm sure. I'm not sure putting a leech in there would make it totally inedible. That was where I was going with this. I think if you look at the evidence as a whole, yes, it was a circumstantial case, but I can't imagine what more circumstantial evidence you would want. You have the defendant in possession of the murder weapon. You have the defendant in possession of the victim's motor vehicle and the victim's car keys. You have the defendant calling the victim's family saying, have you seen the guy? You have the defendant making up these incredible stories to law enforcement agents to try to create an alibi saying, the victim's going to sell cocaine and I want to give you a statement, and the law enforcement say, well, read the statement and sign it, whereupon our elusive Brian is not mentioned. And you have all of this with, and then Mr. Lambert was saying, but the counter to that is what you have, the pathologist. The trouble is, is that if you believe the defendant's story, which is rather hard to do given the number of times that he lied, he got the keys to the victim's motor vehicle on June 1st. That's what he said. He said this mysterious Brian gave him the keys and gave him the gun on June 1. So it just doesn't make a whole lot of sense with respect to that. And like I said, on the other hand, you have all of this evidence, including the testimony about how much the victim prized to this chief, would not let anybody drive it. It was his baby. The contact with law enforcement and the victim's family to create an alibi, the gun in his possession, and that's not this beyond a reasonable doubt, that's overwhelming, overwhelming circumstantial evidence of Mr. Milbourne's guilt. With respect to the second issue, the plea negotiation issue, I have two basic comments. First of all, I'm not aware of any case from the United States Supreme Court where it has held that if there is comment on plea negotiations, there is constitutional error. I'm not aware of a single case that says that. And under the AEDPA, for there to be habeas corpus relief, the complaint of conduct has to be contrary to or unreasonable application of clearly established federal law as established by the Supreme Court of the United States. And the Supreme Court even said that means our holdings as opposed to our dicta. And the best that Mr. Lambros can cite with respect to this particular claim is Kershavall, which I don't think can be read at all to say that if there is a comment about plea negotiations, there is constitutional error. That's my first comment with respect to this claim. My second comment with respect to this claim has to do with the nature of negotiations, just from a common sense standpoint. Negotiations, by common sense, indicate two people talking about something and trying to come to an agreement. In this case, there was no negotiations. In this case, Mr. Milborne was talking to a correctional officer. Nobody, including Mr. Milborne, I would suggest, would believe that that correctional officer had any standing or any ability to negotiate his case. Ordinarily, it's where the defendant talks to an attorney on the other side or something. And I think that if you have a situation, it's correct, Your Honor, and I believe that if you have a situation where the attorneys get together and the attorney brings his client in and they all are sitting around a table and they're trying to negotiate the case and the prosecutor says, Mr. Defendant, tell me exactly what happened in this case. We see these scenes all the time on the television show Law & Order. I've never seen it happen in real life, but it does happen on television. And the defendant says, Well, I did it. And then later on, the prosecutor strolls into court and says, You know what? He did it. And he said he did it and he told it to me in a conference room. That's the kind of error where negotiations would come into play and where there's simply a policy presumption against allowing that kind of evidence to come in. But that's not a situation where a prisoner in a detention facility goes to a correctional officer, I want to plead guilty. The inference is that the jury is going to read that comment as saying, I am guilty. I did the crime. The problem with that is, as you pointed out, Judge Bybee, is if he said, I did it, I committed the crime, I put the body down in the mine shaft, it's clear that that evidence would come in as an admission. What Mr. Lambros would argue is that what is allowable, if directly said, is disallowed if it's indirectly said. And I think that is the ultimate of exalting form over substance. So with respect, and finally I'd say with respect to that issue, that if in fact there is some Supreme Court decision for which I am unaware that makes it illegal or unconstitutional, excuse me, to discuss plea negotiations, that certainly that would be subject to a Brecht analysis and the same Brecht analysis would be applicable with respect to the other issue, in that the evidence in this case is just so compellingly strong against Mr. Milborn that it did not have a substantial and injurious effect on the jury's verdict. So unless your honors have any questions, I think that's what we're down to. We're down to two certified issues for which respondents respectfully suggest there is no constitutional error at all. But if this court were inclined to say that such error occurred, it clearly cannot, given this case, have had a substantial and injurious effect on the verdict. Thank you. Thank you, Mr. Neidert. Mr. Lambros? I really don't need you to address the analogy, but thank you anyway. It was bleach that I said. Okay, good. It does clarify it in my mind that it's a much more powerful analogy than the one I thought you had offered us. Let me just begin by saying that the first that I've heard about whether or not the second question, the admission of the plea evidence was a violation of clearly established laws, is from the podium today. If you look at the respondent's answering brief, they devote a total of two pages to the argument and they don't make that argument. If they had made the argument, what I would have said in my reply brief is that there is circuit authority in this circuit, a case that I actually handled, and I'm sorry I don't have the site, Robinson v. Ignacio, where this same issue came up. And what this court said was, you know, there does not have to be a direct, squarely, on-point United States Supreme Court case if the logical extension of that Supreme Court case would be the kind of error that the petitioner is complaining about. Okay, so where's the logical extension? The logical extension is from Kerchival and Standen. Standen, again, stands for, and it's a Ninth Circuit case, and what Robinson says is that this court under EDVA can look to Ninth Circuit precedent for the error if there can be some linkage to you. Well, yeah, the linkage has got to be pretty strong. We need to have some anchoring Supreme Court decision. That, for you, would be Kerchival. Yeah. And that involved plea negotiations. I believe it did. I'm sorry, I can't remember right now, but certainly Standen did. Plea negotiations involving attorneys? I don't know that. I'm sorry. Okay. Negotiations, anyway. Again, I'm not positive about that. All I know, all I can say right now is that that was the case that was, because in the Standen opinion, Standen, you know, as I recall, and that was also one of my cases, but it talked about how there was not a lot of authority for this type of error because it was so unique, I mean, introduction of a guilty plea. So is the state responsible for the officer's conduct in jail? If he's just an unwilling recipient, he's not inviting this, he's not trying to get a promotion by getting a confession out of this guy, he's just standing there and maybe making some offhand comments to him, and all of a sudden the guy says, call my lawyer, I want to plead guilty, that makes the officer an agent of the DA's office for purposes of the negotiation? He's not an agent. The state is the proponent of the evidence. The state can or cannot choose to introduce that evidence, and as, you know, if a prosecutor's first obligation is to ensure that justice is served, United States v. Berger, he shouldn't have proffered that evidence. I'm not saying that, you know, that the correctional officer had any responsibility here or that, you know, for that matter he was an agent. But, you know, where the rubber meets the road is whether or not the proponent of the evidence should proffer the evidence. And I'm saying that that evidence should not have been proffered because it was unconstitutional. Remember, it seems to me you push the Ninth Circuit precedents a little bit far when you speak of linkage. And it was pretty clear there has to be misapplication of a Supreme Court precedent. We go back to the Supreme Court. We don't try to tease it out precedent by precedent in the circuit. If there's some language in some Ninth Circuit case that says that, it's a bit off base. Right. But, again, you know, I would— Oh, you know, no. I know that we go back to the Supreme Court and say, what's the Supreme Court precedent that's been misapplied? Right, and that issue came up in Robinson. And, again, I wish I would have had an opportunity to brief this. The first time I heard about it was right now. But I can tell you— Well, you know what the Oedipus standard is. Well, yeah, I know the standard is. And, again, it's clearly established Supreme Court— Supreme Court authority. As established by the Supreme Court. But in Robinson, you know, where the petitioner invokes Ferretta, goes Ferretta, and then, just before sentencing, he wants his lawyer back. And the State court said, no, you can't have that, because once you've invoked, you've always invoked. Well, this Court said, well, you know, Ferretta may not directly say that you can reassert your right to counsel at sentencing, but come on. You know, there's linkage there. And that's what I'm saying. I'm saying that, you know, that Standen and Ninth Circuit precedent following Standen supports that conclusion, too. And, again, the only other thing, I think it might have been you, Judge Seiler, you were asking about whether or not there was a motion for mistrial. There was. And that's in the excerpts of record at pages 168 to 177. State said that he thought there was, too. Other than that, unless the Court has any further questions. Thank you, Mr. Lambrow. Thank you very much. Milburn will be submitted, and we will proceed to the next case, which is Boston Telecommunications Group v. Deloitte Touche to Motsu.
judges: Noonan, Siler, Bybee